IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB -4 2016

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| v. | ) | Case No. 1:16-mj-59 |
| HAMZA KOLSUZ, | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James Donovan, being duly sworn, depose and state as follows:

1. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I have served as a Special Agent with HSI since May 2007. I have training and experience in the enforcement of the laws of the United States, including the preparation, presentation, and service of criminal complaints, arrests, and search warrants. As a Special Agent of HSI, I have received training in criminal investigations at the Federal Law Enforcement Training Center. I am currently assigned to the HSI Counter Proliferation Investigations ("CPI") Group in Sterling, Virginia. I have been assigned to the CPI Group since January 2012, having transferred from HSI in Los Angeles, California. For more than four years, I was assigned to the Narcotics Group in HSI Los Angeles. Prior to my employment with HSI, I served as a Captain in the United States Marine Corps. I currently serve in the United States Marine Corps Reserve and have a Master's Degree in Criminal Justice from Georgia State University.

2. Your Affiant is authorized to conduct investigations of suspected criminal violations

1

of various federal laws, including laws criminalizing the smuggling of firearms and firearm parts and violations of United States customs laws and regulations. HSI Special Agents are authorized under statutory authority to apply for and execute arrest and search warrants.

3. Your Affiant personally participated in the investigation of the offenses referred to in this Affidavit and has witnessed many of the facts and circumstances underlying this investigation. Furthermore, some statements contained in this Affidavit are based on reliable information provided to the Affiant by other law enforcement agents, as well as information contained in official documents and reports reviewed in furtherance of the investigation. Moreover, all witness statements are set forth in part and in substance unless otherwise indicated.

4. This Affidavit contains only the information necessary to support probable cause. Accordingly, the information contained in this Affidavit does not constitute each and every fact and matter observed or known to the Government.

5. This Affidavit is submitted in support of a criminal complaint charging HAMZA KOLSUZ ("KOLSUZ") with knowingly and willfully attempting to export or send from the United States to Turkey defense articles designated on the United States Munitions List ("USML"), to wit: firearms components, including eighteen (18) handgun barrels and twenty-six (26) 9mm and .45 caliber handgun magazines, without first obtaining the required license or written approval from the State Department, contrary to Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and Title 22, Code of Federal Regulations, Parts 121 and 127. At all times relevant to the complaint, pursuant to Title 22, United States Code, Section 2778(b)(2), defense articles designated by the President of the United States on the USML may not be exported without a license from the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), unless certain regulatory exceptions apply.

"Defense articles" are items that are specifically designed, developed, configured, adapted, or modified for a military application. In addition, Title 22, Code of Federal Regulations, Part 120, *et seq.*, known as the International Traffic in Arms Regulations ("ITAR"), authorizes DDTC to determine the particular defense articles that constitute the USML. An applicant for an export or import license from DDTC must identify in the required license application the ultimate and final destination of the goods, which in the trade is referred to as the "end user." A willful violation of any of these statutory provisions, or any regulations promulgated thereunder, is a felony. *See* 22 U.S.C. § 2778(c).

6. On the evening of February 2, 2016, KOLSUZ checked in for Turkish Airlines flight number 8. Flight 8 was scheduled to depart Washington Dulles International Airport at 11:10 p.m. EST and arrive in Istanbul, Turkey on February 3, 2016.

7. At the time of check-in, KOLSUZ checked two bags with Turkish Airlines. These bags were received by the airline and tagged. Based on information obtained from law enforcement in New York, KOLSUZ's bags were targeted for inspection. Pursuant to a routine customs inspection of the bags by U.S. Customs and Border Protection ("CBP") officers, items that are designated on the USML were found. At that time, CBP officers contacted an HSI agent. CBP officers and an HSI agent conducted an outbound inspection of KOLSUZ on the jetway. During that inspection, KOLSUZ indicated that he was in possession of firearm parts, specifically, eighteen (18) handgun barrels, twenty-six (26) 9mm and .45 caliber handgun magazines, five (5) under barrel laser aiming modules, and one (1) .22 caliber handgun conversion kit.

8. Category I of the USML expressly applies to "Firearms, Close Assault Weapons and Combat Shotguns." *See* 22 C.F.R. § 121.1. Category I(g) of Section 121.1 pertains to "Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through

3

(d) of this category." Paragraphs (a) through (d) respectively pertain to: (a) "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm), (b) "[f]ully automatic firearms to .50 caliber inclusive (12.7 mm)," (c) "[f]irearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapon systems) having a special military application regardless of caliber," and (d) "[c]ombat shotguns." Furthermore, Category I(h) of Section 121.1 pertains to "Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category." A February 21, 2014 blanket memorandum issued by DDTC explains that 9mm and .45 caliber magazines fall under Category I(h).

9. Based on your Affiant's training and experience, the plain language of Category I of Section 121.1, and a blanket memorandum from DDTC identifying certain firearms and firearms components that DDTC has determined to be USML items, the eighteen (18) handgun barrels possessed by KOLSUZ are items contained in Category I(g) of the USML that cannot be exported without a license from DDTC. Furthermore, the twenty-six (26) 9mm and .45 caliber handgun magazines possessed by KOLSUZ are items contained in Category I(h) of the USML that cannot be exported without a license from DDTC. Based upon KOLSUZ's own admission, he had no license to export these items. In addition, on February 3, 2016, your Affiant queried the Automated Export System ("AES") to ascertain: (1) whether KOLSUZ has ever submitted an Electronic Export Information ("EEI") relative to any export from the United States, and (2) whether KOLSUZ is listed as a License Registrant with DDTC. The query revealed no records associated with KOLSUZ, which indicates that: (1) KOLSUZ neither applied for nor received a license from DDTC prior to his attempted export of United States defense articles; and (2) KOLSUZ is not registered with DDTC to engage in the exportation of defense articles from the

4

United States.

10. After the initial inspection, KOLSUZ was transported to the CBP inspection area where a more thorough customs inspection was conducted. Additional agents from HSI arrived, conferred with CBP Officers, and conducted further record checks.

11. The investigation into KOLSUZ revealed that, on December 2, 2012, KOLSUZ attempted to depart the United States via John F. Kennedy International Airport ("JFK") in Queens, New York. At the time of that attempted departure, KOLSUZ checked two bags and attempted to depart the United States via Delta Airlines flight number 70 destined for Amsterdam, Netherlands. As part of a routine outbound customs inspection, CBP Officers found a wide assortment and substantial quantity of various firearm parts, including upper receiver assemblies, unfinished lower receivers, barrels, magazines, and assorted small parts. These items were found in articles of luggage arranged around KOLSUZ and Rocco and Bayrum BULUT, brothers who had escorted KOLSUZ to JFK but who were not travelling with him. At that time, KOLSUZ was escorted to the CBP inspection area. HSI agents assigned to the New York Field Office responded to JFK and interviewed KOLSUZ. At the time of the interview, a CBP Agricultural Specialist ("AS"), a court-certified Turkish translator who speaks Turkish as her native language, was used to translate. During this interview, KOLSUZ stated that he did not possess any licenses from either the U.S. Department of State or the U.S. Department of Commerce ("DOC") for the legal exportation of the weapon parts. Furthermore, KOLSUZ responded that he believed that no licenses were required and that he did not file shipment information within the Automated Export System ("AES"), which is a Bureau of Census requirement for the export of any licensable commodity. Moreover, KOLSUZ stated to HSI agents that he knew that the metal trigger group or assembly was considered a firearm in the United States. He also

5

indicated that the frame or receivers of most other guns are considered firearms in the United States. KOLSUZ also stated to HSI agents that he would sell the firearm parts to two (2) other businesses in Turkey who would then sell fully assembled firearms to police, military, or other persons in Turkey.

12. In addition to speaking with KOLSUZ on December 2, 2012, HSI agents also spoke with Rocco and Bayrum BULUT. Rocco BULUT ("R BULUT") informed agents that he had been operating a gun parts business for the last two years. R BULUT also stated that he had purchased approximately $6,000.00 worth of firearms parts on behalf of KOLSUZ. Furthermore, R BULUT described his business practices with his brother, Bayram BULUT ("B BULUT"). In describing the business, R BULUT indicated that he often shops for firearms parts online while using his brother's credit card to make the purchase. In an interview with B BULUT, B BULUT advised agents that KOLSUZ has a gun store in Turkey and that KOLSUZ had paid him (B BULUT) $6,000.00 to purchase the gun parts. At one point in the interview, it was explained to KOLSUZ that, because there was a high probability that a license would be required to export these items, the items would be detained by CBP. A total of forty (40) upper receivers, twenty (20) unfinished lower receivers, sixteen (16) firearm barrels, twenty-six (26) firearms magazines, two (2) laser sights for firearms, one (1) Smith & Wesson grip, and three (3) bags containing various small parts and hardware for firearms was detained. As a group, HSI agents advised KOLSUZ, R BULUT, and B BULUT, in both English and Turkish (still utilizing the same court-certified Turkish translator) about PROJECT SHIELD AMERICA—an HSI initiative utilized to educate people about the specific export laws in the United States—and each of the three individuals' responsibilities to lawfully export items from the United States. HSI agents spoke to the three individuals about the different agencies involved with export regulations and the requirements to register with those agencies. Specifically, the HSI agents advised

the group that the two (2) laser aiming devices found in the checked luggage were most likely on the USML, as are many firearms parts, components, and actual firearms. Furthermore, HSI agents advised that a future violation would result in an arrest and criminal charges. All three individuals acknowledged understanding the information provided by the HSI agents. On or about December 6, 2012, DDTC responded to the request for a license determination and advised that the items detained from KOLSUZ are controlled on the USML in Categories I(g) and I(h).

13. Following the inspection and subsequent detention of the items, KOLSUZ stayed in the United States. On January 8, 2013, KOLSUZ again attempted to depart the United States via JFK airport, this time on Delta Airlines flight number 184 destined to Istanbul, Turkey via Paris, France. However, KOLSUZ was again the subject of an outbound customs inspection by CBP Officers. During the inspection of KOLSUZ's one checked bag, CBP officers discovered four (4) firearms components, specifically, one (1) Beretta .380 caliber slide, one (1) barrel, one (1) spring, and one (1) guide rod. Again, KOLSUZ was questioned on the jetway using the same court-certified Turkish translator who translated the December 2, 2012 interview. KOLSUZ told the CBP officers that these items were his own personal firearm components and that a license was not required to legally export them. These items were detained by CBP for a license determination, and HSI agents again responded to JFK. On January 10, 2013, DDTC responded to the request for a license determination and advised that the items detained are controlled on the USML in Categories I(g) and I(h).

14. In March of 2014, HSI agents assigned to the New York Field Office responded to Newark Liberty International Airport ("EWR") to conduct an outbound customs inspection on R BULUT, who was booked on Lufthansa flight number 403 bound for Istanbul, Turkey via Frankfurt, Germany. A CBP customs inspection revealed that R BULUT had checked one piece of luggage. A

subsequent customs inspection identified twenty (20) magazine springs, one (1) Streamlight TLR-4, twenty-five (25) trigger assemblies, one (1) 92F part, three (3) Sig recoil springs, and three (3) Glock recoil springs. Following this discovery, CBP officers and other law enforcement personnel escorted R BULUT back to the CBP inspection area where R BULUT claimed that he was not aware that the firearm parts required an export license. Furthermore, R BULUT claimed that KOLSUZ was his business partner in the business of sending firearm parts to Turkey. R BULUT also claimed that KOLSUZ was serving a prison term of five to seven months in Turkey for making bullets or ammunition without a license. R BULUT also explained that he booked the flight to Turkey on Lufthansa Airlines because he believed that there would be less scrutiny by Turkish authorities of passengers on Lufthansa as opposed to passengers arriving on Turkish Airlines. R BULUT stated that he sells firearms at a shop in Turkey with KOLSUZ and described how a Glock handgun that is purchased in the United States for $500.00 could be sold in Turkey for $2,000.00 to $2,500.00. Moreover, R BULUT again explained how the parts he brought into Turkey are later assembled into complete firearms for sale in Turkey.

15. Following KOLSUZ's attempt to depart the United States on February 2, 2016, and the subsequent HSI investigation, HSI agents, utilizing a certified language specialist employed by United States Citizenship and Immigration Services ("USCIS"), interviewed KOLSUZ in the CBP inspection area located at Washington Dulles International Airport. KOLSUZ was administered an Advisement of Rights (Miranda Warning). At that time, KOLSUZ indicated that he was willing to answer any questions. KOLSUZ acknowledged that he entered the United States at Miami International Airport on January 25, 2016 with the intention of sightseeing in Florida with a friend named "Bayram Bulut" (B BULUT): the same

8

individual who was previously interviewed by HSI agents in connection with KOLSUZ's December 2, 2012 attempt to export items on the USML to Turkey. In that interview, B BULUT stated that KOLSUZ owns a firearm store in Turkey. During the February 2, 2016 interview, KOLSUZ stated that, when he entered the United States, he was in possession of $9,000. KOLSUZ further claimed that during the recent visit to the United States, he had visited numerous gun shops, pawn shops, and a gun show in Florida.

16. In addition to the information about his current trip, KOLSUZ acknowledged his previous encounters with U.S. Customs officials and claimed that he lost approximately $15,000.00 when CBP seized his firearm components on December 2, 2012. During questioning, KOLSUZ indicated that, after his firearm parts were seized by CBP, he hired an attorney in an attempt to retrieve his items, but that he was unsuccessful in doing so. When asked if the attorney advised KOLSUZ as to why the attorney was unable to get the items back, KOLSUZ had no answer. Furthermore, KOLSUZ claimed that he was advised that he needed a license to export the items but also claimed that he was advised that he was not an "FFL" (a "Federal Firearm Licensee") and therefore would not need a license. KOLSUZ was unable to identify who advised him of these federal license requirements for firearm parts. In further questioning, KOLSUZ admitted that he had the knowledge, skills, and ability to manufacture firearm parts. He indicated that his only limitation to manufacturing the parts to make a functioning firearm was time. At one point in the interview he stated that he could make a firearm from a chair.

17. Based on the foregoing, there is probable cause to believe that, on or about February 2, 2016, within the Eastern District of Virginia, the defendant, HAMZA KOLSUZ did knowingly and

willfully attempt to export or send from the United States to Turkey defense articles designated on the USML without first obtaining the required license or written approval from the State Department, contrary to Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and Title 22, Code of Federal Regulations, Parts 121 and 127.

James Donovan, Special Agent
Department of Homeland Security

Subscribed and sworn to before
me this 4th day of February, 2016.

_____/s/_____
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge
Eastern District of Virginia, Alexandria Division

10